# United States Court of Appeals
# for the Federal Circuit

---

**IN RE: QUEEN'S UNIVERSITY AT KINGSTON, PARTEQ RESEARCH AND DEVELOPMENT INNOVATIONS,**
*Petitioners*

---

2015-145

---

On Petition for Writ of Mandamus to the United States District Court for the Eastern District of Texas in No. 2:14-cv-00053-JRG-RSP, Magistrate Judge Roy S. Payne, Judge J. Rodney Gilstrap.

---

Decided: March 7, 2016

---

SHAWN DANIEL BLACKBURN, Susman Godfrey L.L.P., Houston, TX, argued for petitioners. Also represented by IAN B. CROSBY, RACHEL S. BLACK, Seattle, WA.

MATTHEW WOLF, Arnold & Porter LLP, Washington, DC, argued for respondents Samsung Electronics Co., Ltd., Samsung Telecommunications America, LLC. Also represented by JOHN NILSSON, JIN-SUK PARK.

---

Before LOURIE, O'MALLEY, and REYNA, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* O'MALLEY.

Dissenting opinion filed by *Circuit Judge* REYNA.

O'MALLEY, *Circuit Judge.*

Petitioners Queen's University at Kingston and PARTEQ (together, "Queen's University") are engaged in a patent infringement action against Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (together, "Samsung") in the United States District Court for the Eastern District of Texas. They seek a writ of mandamus directing the district court to withdraw its order compelling the production of Queen's University's communications with its non-attorney patent agents on grounds that the communications are privileged. We grant the petition.

BACKGROUND

Queen's University at Kingston was established in 1841 and is located in Kingston, Ontario, Canada. In 1987, Queen's University founded PARTEQ Innovations in order to commercialize intellectual property arising from university-generated research. Queen's University is the assignee of U.S. Patent Nos. 7,762,665; 8,096,660; and 8,322,856 (the "patents-in-suit"), and PARTEQ is the exclusive licensee. The patents-in-suit are directed to Attentive User Interfaces, which allow devices to change their behavior based on the attentiveness of a user—for example, pausing or starting a video based on a user's eye-contact with the device.

On January 31, 2014, Queen's University filed a complaint alleging patent infringement in the Eastern District of Texas against Samsung. In particular, Queen's University alleged that Samsung's SmartPause feature—which is in many of Samsung's newest devices—infringed the patents-in-suit. The district court set trial for November 9, 2015.

Throughout fact discovery, Queen's University refused to produce certain documents it believed contained privileged information. It produced three privilege logs

that withheld documents based, *inter alia*, on its assertion of a privilege relating to communications with its patent agents (we, like the parties, refer to this as a "patent-agent privilege"). Samsung moved the district court to compel the production of these documents, which included communications between Queen's University employees and registered non-lawyer patent agents discussing the prosecution of the patents-in-suit. *See* Samsung's Motion to Compel Documents, *Queen's Univ. at Kingston v. Samsung Elecs. Co.*, No. 2:14-CV-53-JRG-RSP (E.D. Tex. June 1, 2015), ECF No. 134. After holding a hearing on the matter, the magistrate judge granted Samsung's motion to compel, finding that the communications between Queen's University employees and their non-attorney patent agents are not subject to the attorney-client privilege and that a separate patent-agent privilege does not exist. *See* Minute Entry for Proceedings Held Before Magistrate Judge Roy S. Payne, *Queen's* (E.D. Tex. June 17, 2015), ECF No. 149.

Queen's University filed an objection to the magistrate judge's order, which the district court overruled. The district court declined to certify the issue for interlocutory appeal, but agreed to stay the production of the documents at issue pending a petition for writ of mandamus. Order, *Queen's* (E.D. Tex. July 13, 2015), ECF No. 179. This petition followed and we ordered additional briefing and argument to address it. Because any appeal from the final judgment of the district court will be taken to this court, we have jurisdiction to consider the petition under 28 U.S.C. § 1651(a) (2012).

DISCUSSION

A. Choice of Law

When reviewing a district court's decision, we apply the law of the regional circuit where that district court sits for non-patent issues, but we apply our own law for questions impacting substantive patent questions. *See In*

*re Spalding Sports World Wide, Inc.*, 203 F.3d 800, 803–04 (Fed. Cir. 2000). Regarding discovery matters, this court has "held that Federal Circuit law applies when deciding whether particular written or other materials are discoverable in a patent case, if those materials relate to an issue of substantive patent law." *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1307 (Fed. Cir. 2001). "[W]e will apply our own law to both substantive and procedural issues intimately involved in the substance of enforcement of the patent right." *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed. Cir. 2006) (internal quotation marks omitted) (quoting *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004)). "[A] procedural issue that is not itself a substantive patent law issue is nonetheless governed by Federal Circuit law if the issue pertains to patent law, if it bears an essential relationship to matters committed to our exclusive control by statute, or if it implicates the jurisprudential responsibilities of this court in a field within its exclusive jurisdiction." *Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1359 (Fed. Cir. 1999) (en banc in relevant part) (citations and internal quotation marks omitted).

Applying these standards, we have held that we apply our own law when deciding whether particular documents are discoverable in a patent case because they relate to issues of validity and infringement. *See id.* (citing *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1212 (Fed. Cir. 1987) ("[A] determination of relevance implicates the substantive law of patent validity and infringement. Hence, we look to Federal Circuit law.")). We have also held that we apply our own law when making "a determination of the applicability of the attorney-client privilege to [a party's] invention record [because it] clearly implicates, at the very least, the substantive patent issue of inequitable conduct." *Spalding*, 203 F.3d at 803–04. Similarly, this case involves the applicability

of privilege for a patentee's communications with a non-attorney patent agent regarding prosecution of the patents-in-suit. Those types of communications are potentially relevant to numerous substantive issues of patent law, including claim construction, validity, and inequitable conduct. *See Spalding*, 203 F.3d at 803–04; *Midwest Indus.*, 175 F.3d at 1359. Accordingly, we apply our own law.

## B. Mandamus Review

In deciding whether to grant mandamus review for discovery orders that turn on claims of privilege, we consider whether: "(1) there is raised an important issue of first impression, (2) the privilege would be lost if review were denied until final judgment, and (3) immediate resolution would avoid the development of doctrine that would undermine the privilege." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1367 (Fed. Cir. 2007) (en banc) (internal quotation marks omitted) (quoting *In re Regents of the Univ. of Cal.*, 101 F.3d 1386, 1388 (Fed. Cir. 1996)). "Mandamus may thus be appropriate in certain cases to further supervisory or instructional goals where issues are unsettled and important." *In re Nintendo Co.*, 544 F. App'x 934, 936 (Fed. Cir. 2013) (citing *In re BP Lubricants USA Inc.*, 637 F.3d 1307, 1313 (Fed. Cir. 2011)).

Importantly, a writ of mandamus may be granted to overturn a district court order "only when there has been a clear abuse of discretion or usurpation of judicial authority in the grant or denial of the order." *Connaught Lab., Inc. v. SmithKline Beecham P.L.C.*, 165 F.3d 1368, 1370 (Fed. Cir. 1999); *see also Schlagenhauf v. Holder*, 379 U.S. 104, 110 (1964) (finding that "the writ is appropriately issued . . . when there is 'usurpation of judicial power' or a clear abuse of discretion" (quoting *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1953))). To prevail, a petitioner must establish that it has no other adequate means to attain the desired relief and that its

right to issuance of the writ is "clear and indisputable." *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380–81 (2004); *see also In re Regents of the Univ. of Cal.*, 101 F.3d at 1387 (finding that the petitioner has the burden of establishing "that its right to issuance of the writ is clear and indisputable, and that it lacks adequate alternative means to obtain the relief sought") (citing *Mallard v. U.S. Dist. Court*, 490 U.S. 296, 309 (1989); *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35, (1980)). As the issuing court, moreover, once the petitioner establishes the two prerequisites, we then have discretion to determine whether the writ is appropriate under the circumstances. *Cheney*, 542 U.S. at 381.

In its petition, Queen's University argued that mandamus is appropriate as it is its only remedy. *See* Queen's University Appellant Br. 1–5. It argued, moreover, that the discovery order it petitions this court to overturn raises an issue of first impression. *Id.* Finally, it asserted that, if the discovery order is left in place and the communications-at-issue are produced, "the confidentiality of those communications will be lost forever" as "[t]he [c]ourt cannot unring that bell." *Id.* at 3. In its response to Queen's University's petition, Samsung contended that mandamus is inappropriate because, even if we were to find that a patent-agent privilege exists such that the discovery order is clearly erroneous, the privilege issue can be reviewed as part of a complete appeal. *See* Samsung Pet'r Br. 14–17.

After careful consideration, we concluded that mandamus review of the district court's discovery order in this case appeared appropriate. This court has not addressed whether a patent-agent privilege exists—it is an issue of first impression for this court and one that has split the

district courts.[1]  Immediate resolution of this issue will avoid further inconsistent development of this doctrine. *See In re MSTG, Inc.*, 675 F.3d 1337, 1342 (Fed. Cir. 2012) ("Mandamus review is appropriate here as to the privilege issue.  The issue of whether settlement negotiations are privileged is a matter of first impression before this court and one on which district courts are split.").

If we were to deny mandamus, moreover, the confidentiality of the documents as to which such privilege is asserted would be lost.  In the event that the documents were produced and a judgment on the merits reached, it would be difficult—if not impossible—for this court to

---

[1]     *Compare, e.g.*, *Buyer's Direct Inc. v. Belk, Inc.*, No. SACV 12-00370-DOC, 2012 WL 1416639, at *3 (C.D. Cal. Apr. 24, 2012) (recognizing patent-agent privilege); *Polyvision Corp. v. Smart Techs. Inc.*, No. 1:03-cv-476, 2006 WL 581037, at *2 (W.D. Mich. Mar. 7, 2006) (same); *Mold Masters Ltd. v. Husky Injection Molding Sys., Ltd.*, No. 01 C 1576, 2001 WL 1268587, at *4–*5 (N.D. Ill. Nov. 15, 2001) (same); *Dow Chem. Co. v. Atl. Richfield Co.*, No. 83-cv-3763, 1985 WL 71991, at *5 (E.D. Mich. Apr. 23, 1985) (same); *In re Ampicillin Antitrust Litig.*, 81 F.R.D. 377, 383–84, 391–94 (D.D.C. 1978) (same); *Vernitron Med. Prods., Inc. v. Baxter Labs., Inc.*, No. 616-73, 1975 WL 21161, at *1–*2 (D.N.J. Apr. 29, 1975) (same), *with Prowess, Inc. v. Raysearch Labs. AB*, No. WDQ-11-1357, 2013 WL 247531, at *5 (D. Md. Jan. 18, 2013) (declining to recognize patent-agent privilege); *Park v. Cas Enters., Inc.*, No. 08-cv-0385 2009 WL 3565293, at *3 (S.D. Cal. Oct. 27, 2009) (same); *In re Rivastigmine Patent Litig.*, 237 F.R.D. 69, 102 (S.D.N.Y. 2006) (same); *Agfa Corp. v. Creo Prods.*, No. Civ. A. 00-10836-GAO, 2002 WL 1787534, at *3 (D. Mass. Aug. 1, 2002) (same); *and Sneider v. Kimberly-Clark Corp.*, 91 F.R.D. 1, 5 (N.D. Ill. 1980) (same).

disentangle the effect of the production of the allegedly privileged documents from other considerations that led to the judgment. *See Spalding*, 203 F.3d at 804 ("[W]hen a writ of mandamus is sought to prevent the wrongful exposure of privileged communications, the remedy of mandamus is appropriate 'because maintenance of the attorney-client privilege up to its proper limits has substantial importance to the administration of justice, and because an appeal after disclosure of the privileged communication is an inadequate remedy.'") (quoting *In re Regents of Univ. of Cal.*, 101 F.3d at 1387).

Understanding that the legal standard for obtaining mandamus relief is an exacting one, we found it likely satisfied here and ordered additional briefing and argument on the merits of the privilege claim asserted.

In its supplemental briefing, Samsung informed the court that it had filed a request for *inter partes* review ("IPR") on the patents-in-suit, that the United States Patent and Trademark Office ("USPTO" or "Patent Office") had instituted those IPRs, and that the district court had stayed the proceedings pending a ruling from the Patent Office. Samsung now argues that the current stay of the district court action and the existence of the IPRs constitute changed circumstances that warrant denial of the petition for writ of mandamus, regardless of the merits. Samsung Pet'r Br. 17–18.

Queen's University filed its petition for writ of mandamus in this court on July 17, 2015. Dkt. No. 1. The magistrate judge stayed the production of the relevant documents pending resolution of that petition in this court. Order Granting Stay of Production, *Queen's* (E.D. Tex. July 13, 2015), ECF No. 179. Samsung then moved to stay the proceedings entirely under the theory that (1) the pending writ of mandamus would prejudice its ability to prepare for trial, and (2) the refusal to grant a stay would effectively give Queen's University the relief it

sought, since trial likely would proceed before this court could resolve the privilege issue. Samsung's Emergency Motion to Stay Pending Writ of Mandamus, *Queen's* (E.D. Tex. July 20, 2015), ECF No. 189. While that motion was pending, the Patent Trial and Appeal Board (the "Board") instituted IPRs against all asserted claims of the patents-in-suit. *See Queen's* (E.D. Tex. August 10, 2015), ECF No. 197; *Queen's* (E.D. Tex. July 31, 2015), ECF No. 194. The magistrate judge then *sua sponte* ordered supplemental briefing on whether institution of the IPR affects its earlier stay of Queen's University's discovery obligation. *Queen's* (E.D. Tex. Aug. 14, 2015), ECF No. 199.

The court concluded—as it had previously found—that the "production remains stayed pending resolution by the Federal Circuit." Stay Order at 2, *Queen's* (E.D. Tex. Aug. 28, 2015), ECF No. 214. The magistrate judge further found that:

> [g]iven the stay of Plaintiffs' production obligations in light of their petition for writ, and further in view of the pending IPR proceedings that have been instituted as to all asserted claims (Dkt. Nos. 194, 197), the Court hereby **STAYS** the instant matter until the later of the Federal Circuit's resolution of Plaintiffs' writ, or the PTAB's final adjudication in all instituted IPR proceedings.

*Id.*

Samsung contends that this order means there is no longer any imminent threat to Queen's University regarding its production obligations. Samsung Pet'r Br. 17. As Queen's University noted at oral argument, however, while the district court did stay the proceedings based on the IPRs, it invoked only the pending mandamus petition to stay the production of documents withheld by Queen's University. Oral Arg. at 02:14–02:59, *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2015-0145.mp3; s*ee* Stay Order, *Queen's* (E.D. Tex. Aug. 28,

2015), ECF No. 214 at 2 ("[T]he Court elected to stay Plaintiffs' production 'pending disposition of the petition or other order of the Court of Appeals.' (Dkt. No. 179) That production remains stayed pending resolution by the Federal Circuit."). We too do not read the district court order as foreclosing the possibility that a denial of the writ will require the challenged production even if the remainder of the proceedings is stayed for other reasons. There is, furthermore, no certainty as to when the IPR proceedings will end or what precisely those proceedings will resolve. It remains likely that some or all of the documents as to which privilege is claimed are at risk of disclosure. It also remains likely that a panel of this court will be asked to review the very merits issues this panel already has considered at length. And, it remains virtually certain that future district courts will be asked to address almost identical privilege claims. For these reasons, while the IPR proceedings and accompanying stay certainly weigh against mandamus relief, we do not believe those changed circumstances offset the importance of resolving this issue and clarifying a question with which many district courts have struggled, and over which they disagree.

Turning to the merits, Queen's University's right to the issuance of the writ turns on whether a patent-agent privilege exists. Because we find that such a privilege should be acknowledged, we find that Queen's University's "right to issuance of the writ is clear and indisputable, and . . . it lacks adequate alternative means to obtain the relief sought." *Spalding*, 203 F.3d at 804–05.

### C. Existence of the Patent-Agent Privilege

In federal district courts, the scope of discovery is governed by Rule 26(b)(1) of the Federal Rules of Civil Procedure, which provides in relevant part: "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional

to the needs of the case . . . .   Information within this scope of discovery need not be admissible in evidence to be discoverable."   Thus, while the scope of permissible discovery is broad, it only encompasses documents relating to "nonprivileged matter[s]."

Rule 501 of the Federal Rules of Evidence addresses what is privileged.   Rule 501 states:

> The common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege unless any of the following provides otherwise:
>
> - the United States Constitution;
>
> - a federal statute; or
>
> - rules prescribed by the Supreme Court.
>
> But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.

Fed. R. Evid. 501.   "Rule 501 of the Federal Rules of Evidence authorizes federal courts to define new privileges by interpreting 'common law principles.'"   *Jaffee v. Redmond*, 518 U.S. 1, 8 (1996).   Rule 501 "did not freeze the law governing the privileges of witnesses in federal trials at a particular point in our history, but rather directed federal courts to 'continue the evolutionary development of testimonial privileges.'"   *Jaffee,* 518 U.S. at 8–9 (quoting *Trammel v. United States,* 445 U.S. 40, 47 (1980)).   Samsung does not contend that recognition of a patent-agent privilege is foreclosed by the United States Constitution, any federal statute, or any rule prescribed by the Supreme Court.   We thus turn to "reason and experience" in order to determine whether a patent-agent privilege is now appropriate.

We do so with caution, however, recognizing that there is a presumption against the recognition of new

privileges. Federal courts must be cognizant of the age-old principle that "the public . . . has a right to every man's evidence." *United States v. Bryan,* 339 U.S. 323, 331 (1950). Indeed, the Supreme Court has warned that evidentiary privileges "are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon,* 418 U.S. 683, 710 (1974).

The most well-known and carefully guarded privilege is the attorney-client privilege. It is well established that an attorney-client privilege exists to "encourage full and frank communication" between counselor and client and "thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *accord Trammel,* 445 U.S. at 51 ("[P]rivilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out."). It is also without question that the privilege attaches to a communication made "for the purpose of securing primarily legal opinion, or legal services, or assistance in a legal proceeding." *Spalding*, 203 F.3d at 805; *see also Upjohn,* 449 U.S. at 389 (stating that legal advice "can only be safely and readily availed of when free from the consequences or the apprehension of disclosure").

It is true, moreover, that courts have consistently refused to recognize as privileged communications with other non-attorney client advocates, such as accountants. *See Couch v. United States*, 409 U.S. 322, 335 (1973); *see also United States v. Arthur Young & Co.*, 465 U.S. 805, 817 (1984) ("In light of *Couch*, the Court of Appeals' effort to foster candid communication between accountant and client by creating a self-styled work-product privilege was misplaced, and conflicts with what we see as the clear intent of Congress."). The same is true for jailhouse lawyers. *See, e.g.*, *Velasquez v. Borg*, No. 93-15566, 1994

WL 327328, at *1 (9th Cir. June 8, 1994) ("Because [Petitioner] does not contend that he thought [the jailhouse lawyer] was authorized to practice law, he has not proven a violation of the attorney-client privilege as traditionally understood."); *Moorhead v. Lane*, 125 F.R.D. 680, 686–87 (C.D. Ill. 1989) (refusing to extend the attorney-client privilege "to communications made to a 'jailhouse attorney.'").

Samsung concedes that, where a patent agent communicates with counsel or receives communications between his client and counsel, the attorney-client privilege may protect those communications from discovery. *See, e.g.*, *Park v. Cas Enters., Inc.*, No. 08-cv-03, 2009 WL 3565293, at *3 (S.D. Cal. Oct. 27, 2009). It contends, however, that, where counsel is not involved in the communications—as Queen's University concedes is the case here—we should neither expand the scope of the attorney-client privilege nor recognize an independent patent-agent privilege to protect such communications from discovery. For the reasons we explain, we find that the unique roles of patent agents, the congressional recognition of their authority to act, the Supreme Court's characterization of their activities as the practice of law, and the current realities of patent litigation counsel in favor of recognizing an independent patent-agent privilege.

In *Sperry v. State of Florida ex rel. Florida Bar*, 373 U.S. 379 (1963), the Supreme Court was faced with a challenge to the State of Florida's attempt to regulate the activities of patent agents on grounds that those activities constitute the practice of law. The Supreme Court addressed the challenge in two stages: first, determining whether the activities of patent agents before the Patent Office constitute the practice of law, and, second, determining whether, if so, the State of Florida had the authority to regulate those activities. The Supreme Court answered the first question in the affirmative and the second in the negative.

The Supreme Court expressly found that "the preparation and prosecution of patent applications for others constitutes the practice of law." *Id.* at 383. The Court concluded that:

> [s]uch conduct inevitably requires the practitioner to consider and advise his clients as to the patentability of their inventions under the statutory criteria, 35 U.S.C. §§ 101–103, 161, 171, as well as to consider the advisability of relying upon alternative forms of protection which may be available under state law. It also involves his participation in the drafting of the specification and claims of the patent application, 35 U.S.C. § 112, which this Court long ago noted "constitute[s] one of the most difficult legal instruments to draw with accuracy."

*Id.* (citations omitted). *Sperry*, thus, confirms that patent agents are not simply engaging in law-like activity, they are engaging in the practice of law itself. To the extent, therefore, that the traditional attorney-client privilege is justified based on the need for candor between a client and his or her legal professional in relation to the prosecution of a patent, that justification would seem to apply with equal force to patent agents.

While this threshold conclusion in *Sperry* is important to our decision, it is the rest of the *Sperry* opinion we find most informative. It is not the fact that—within the limited authority granted to them by the Patent Office—patent agents engage in the traditional practice of law that is the most meaningful takeaway from *Sperry*, it is the Supreme Court's explanation of why states may not regulate that practice of law that lends most support to the recognition of a patent-agent privilege. In holding that the State of Florida had no authority to regulate the admitted practice of law by patent agents, the Supreme Court emphasized that it is Congress who has authorized and continues to permit the practice of law by patent

agents when appearing before the Patent Office. *See id.* at 379 ("'[T]he law of the State, though enacted in the exercise of powers not controverted, must yield' when incompatible with federal legislation. Congress has provided that the Commissioner of Patents 'may prescribe regulations governing the recognition and conduct of agents, attorneys, or other persons representing applicants or other parties before the Patent Office,' 35 U.S.C. § 31, and the Commissioner, pursuant to § 31, has provided by regulation that '(a)n applicant for patent . . . may be represented by an attorney *or* agent authorized to practice before the Patent Office in patent cases.' 37 CFR § 1.31." (citing *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824) (footnote omitted) (emphasis added)).

In explaining its holding, the Supreme Court discussed the history of the Patent Office's power to regulate patent agents. *Id.* at 388–400. Looking to legislative history, the Court traced the discussion of patent agents by Congress "back to 1861, when Congress first provided that 'for gross misconduct [the Commissioner of Patents] may refuse to recognize any person as a patent agent, either generally or in any particular case . . . .'" *Id.* at 388 (quoting Act of March 2, 1861, ch. 88, § 8, 12 Stat. 247). The 1869 "Rules and Directions" issued by the Commissioner "provided that '(a)ny person of intelligence and good moral character may appear as the attorney in fact or agent of an applicant upon filing proper power of attorney.'" *Id.* at 388–89 (quoting Rules and Directions for Proceedings in the Patent Office, § 127 (Aug. 1, 1869)). "From the outset, a substantial number of those appearing in this capacity were engineers or chemists familiar with the technical subjects to which the patent application related. 'Many of them were not members of the bar. It probably never occurred to anybody that they should be.'" *Id.* at 389 (quoting Letter from Edward S. Rogers, *Hearings on H.R. 5527 Before the H. Comm. on Patents*, 70th Cong., 1st Sess. 84 (1928)). In 1899, because non-

attorney agents were found "particularly responsible for the deceptive advertising and victimization of inventors" at the Patent Office, the Commissioner first required the registration of those who practiced before the Office. *Id.* at 390 (citation omitted). Then, "in 1922, the [patent] statute was amended to expressly authorize the Commissioner to prescribe regulations for the recognition of agents and attorneys," "to provide for the 'creation of a patent bar[,]' and 'to require a higher standard of qualifications for registry.'" *Id.* at 390–91 (citations omitted).

In response to a provision in a proposed bill designed to make it a criminal offense to misrepresent oneself as a registered patent practitioner, Congress discussed the distinction between patent lawyers and non-lawyer agents. *Id.* at 393. "[T]ime and again it was made clear that the . . . provision was not intended to restrict practice by agents, but was designed only to prevent them from labeling themselves 'patent attorneys,' as the Patent Office had theretofore permitted." *Id.* (footnote omitted). Congress made clear that it did not intend to hinder the Patent Office's right to allow non-attorney agents to prosecute patents before it, but only to prevent them from improperly holding themselves out as attorneys:

> The proposed bills would not have affected "any engineers or draftsmen from doing those things which they have always been doing before the Patent Office"; the bills sought "to bring about no change in the status of the many men now registered and *entitled to practice before the Patent Office*, regardless of whether they are members of the bar or not . . . ." (Emphasis added.) "[T]here are quite a number of solicitors of patents who are highly qualified and who are not members of the bar, who never graduated at law and were never admitted to the bar. But this bill doesn't disqualify those men. *They can continue to qualify as patent agents*." (Emphasis added.) When asked

> "[w]hat is going to be the difference in the legal prerogatives of the agents and the others that come in," the Commissioner of Patents responded that "[t]*heir rights in the Patent Office will be exactly the same.* Their rights in the courts will be different." (Emphasis added.)

*Id.* at 393–95 (footnotes omitted). In view of this storied history, the Supreme Court found "strong and unchallenged implications that registered agents have a right to practice before the Patent Office." *Id.* at 395. Samsung does not challenge the proposition that the prosecution of patents before the Patent Office constitutes the practice of law or that non-lawyer patent agents are allowed to engage in such practice under federal law. Nor can it, given the Supreme Court's clear language in *Sperry*.[2]

---

[2] The fact that, in the context of describing the authority given to patent agents before the Patent Office, the Commissioner of Patents mentioned that a patent-agent privilege was not then assertable in court does not, as the dissent implies, mean that Congress considered and rejected the creation of such a privilege. The Commissioner had no authority to create in-court privileges. The comment, moreover, was unrelated to the actual purpose for which the Commissioner's testimony was solicited—*i.e.*, the treatment of patent agents and patent attorneys before the Patent Office. More importantly, however, neither the Commissioner nor Congress could have foreseen in 1928 that patent litigation would expand as it has or that the prosecution history of patents would take on such a meaningful role in that litigation, both in connection with claim construction and in connection with a variety of invalidity and unenforceability challenges. The purpose of Rule 501 is to grant courts the authority—and, where appropriate, the obligation—to acknowledge

The debate about whether to allow non-attorney patent agents to practice law before the Patent Office "received continuing attention both in and out of Congress during the period prior to 1952." *Id.* at 398. In *Sperry,* the Court found that the rights conferred to patent agents are federal rights and that Congress expressly permitted the Commissioner to promulgate regulations that allow patent agents to practice before the Patent Office in the 1952 Patent Act.[3] Ultimately, Congress endorsed a system in which patent applicants can choose between patent agents and patent attorneys when prosecuting patents before the Patent Office. Based on this, the Court found that the State of Florida could neither prohibit nor regulate that which federal law allowed. *Id.* at 379.

Today, "[t]he Office—may establish regulations, not inconsistent with law, which—may govern the recognition and conduct of agents, attorneys, or other persons representing applicants or other parties before the Office." 35 U.S.C. § 2(b)(2)(D). Pursuant to these powers, the Office has determined that "[a]ny citizen of the United States who is not an attorney, and who fulfills the requirements of this part may be registered as a patent agent to practice before the Office." 37 C.F.R. § 11.6(b).

To the extent Congress has authorized non-attorney patent agents to engage in the practice of law before the Patent Office, reason and experience compel us to recognize a patent-agent privilege that is coextensive with the rights granted to patent agents by Congress. A client has a reasonable expectation that all communications relating to "obtaining legal advice on patentability and legal services in preparing a patent application" will be kept

---

new privileges where changing circumstances and considerations so warrant.

[3]     The *Sperry* Court relied on 35 U.S.C. § 31, which has since been replaced by 35 U.S.C. § 2(b)(2)(D).

privileged. *See Spalding*, 203 F.3d at 806. Whether those communications are directed to an attorney or his or her legally equivalent patent agent should be of no moment. Indeed, if we hold otherwise, we frustrate the very purpose of Congress's design: namely, to afford clients the freedom to choose between an attorney and a patent agent for representation before the Patent Office.[4]

Despite Samsung's arguments, *Jaffee* does not compel a contrary result. Samsung argues that none of the considerations set forth by the Supreme Court in *Jaffee* in recognizing a psychotherapist privilege under Rule 501 of the Federal Rules of Evidence support the privilege we recognize here. In *Jaffee*, the Court relied on a number of factors to determine that "a privilege protecting confidential communications between a psychotherapist and her patient 'promotes sufficiently important interests to

---

[4] The Patent Office recently issued a "Request for Comments on Domestic and International Issues Related to Privileged Communications Between Patent Practitioners and Their Clients." 80 Fed. Reg. 3953 (Jan. 26, 2015). In response, the Patent Office received comments from the Australian Government, as well as a number of domestic and international trade groups, individuals, and companies. *See Roundtable on Domestic and International Issues Related to Privileged Communications Between Patent Practitioners and Their Clients,* http://www.uspto.gov/learning-and-resources/ip-policy/roundtable-domestic-and-international-issues-related-privileged. To the extent these comments addressed the creation of a domestic, patent-agent privilege, they unanimously advocated for the recognition of a patent-agent privilege. While such comments are, of course, neither dispositive nor even legally persuasive, they are consistent with our conclusion that the recognition of a patent-agent privilege is appropriate.

outweigh the need for probative evidence.'" *Jaffee*, 518 U.S. at 9–10 (citing *Trammel*, 445 U.S. at 51). Among those factors was the recognition of a psychotherapist-patient privilege by the States, the endorsement of such a privilege by a Judicial Conference Advisory Committee, and the need for trust and confidence between the client and psychotherapist. *Id.* at 10–15. We agree that the circumstances addressed in *Jaffee* are vastly different from those we address, and that the considerations upon which the Supreme Court rested its decision in *Jaffee* are not all applicable here. Nothing in *Jaffee* counsels against our conclusion today, however.

First, in *Jaffee*, there was no clear congressional intent to authorize an agency to create and regulate a group of individuals with specific authority to engage in the practice of law. As discussed above, Congress clearly intended to allow the Patent Office to authorize non-attorney patent agents to practice before it and Congress has amended the Patent Act since *Sperry* characterized that activity as the practice of law, but has left the authority of patent agents intact. Given this fact, the case for the recognition of a patent-agent privilege is perhaps even stronger than that for the psychotherapist-patient privilege defined in *Jaffee*.

Second, while the *Jaffee* Court was able to rely on a unanimous consensus among the States to justify the creation of the psychotherapist privilege, that fact is irrelevant given the uniquely federal character of the activities at issue here.[5] *Sperry* clearly held that "[a] State may not enforce licensing requirements which,

---

[5]    *Jaffee*, 518 U.S. at 12 ("That it is appropriate for the federal courts to recognize a psychotherapist privilege under Rule 501 is confirmed by the fact that all 50 States and the District of Columbia have enacted into law some form of psychotherapist privilege.").

though valid in the absence of federal regulation, give 'the State's licensing board a virtual power of review over the federal determination' that a person or agency is qualified and entitled to perform certain functions." 373 U.S. at 385 (quoting *Leslie Miller, Inc. v. State of Ark.*, 352 U.S. 187, 190 (1956)). Neither legislative action by the States nor judicial decision by state courts on the issue of patent-agent privilege would be appropriate. Under *Sperry*, the States do not have legislative authority to enact laws that conflict with the federal determination that patent agents may practice law before the Patent Office; they, thus, have no interest in whether communications regarding that activity are privileged. States also have no authority to create privileges applicable to patent actions in federal court.[6]

Third, while Samsung points to the fact that, in *Jaffee*, the Court found that the recognition of the psycho-therapist-patient privilege by the Judicial Conference Advisory Committee on Evidence Rules "reinforced" the unanimous consensus among the States, it remains true that if the Advisory Committee does *not* recognize a privilege, "that fact standing alone would not compel the federal courts to refuse to recognize a privilege." *United States v. Gillock*, 445 U.S. 360, 367 (1980). This is especially true given that it was the Advisory Committee itself that in 1974 recommended adoption of Rule 501 in its current form—leaving to the courts the role of acknowledging new privileges and taking the Advisory Committee

---

[6] We note, moreover, that there are only rare circumstances in which communications with patent agents would ever be at issue in non-patent, state-court matters. Notably, in state court malpractice cases against patent agents, the patent-agent privilege would be waived by the very filing of the action.

out of the business of needing to do so, barring undue delay by the courts.

Finally, analogies to the attorney-client and spousal privileges which the *Jaffee* Court discussed actually support our conclusion that a patent-agent privilege is justified. The Court found that creation of the psychotherapist-patient privilege was appropriate in light of its comparison with the attorney-client and spousal privileges because each "is 'rooted in the imperative need for confidence and trust.'" *Jaffee*, 518 U.S. at 10 (quoting *Trammel*, 445 U.S. at 51). Likewise, the lack of a patent-agent privilege would hinder communications between patent agents and their clients, undermining the real choice Congress and the Commissioner have concluded clients should have between hiring patent attorneys and hiring non-attorney patent agents.[7] In this way, we find that recognition of the patent-agent privilege "serves public ends." *Upjohn*, 449 U.S. at 389. Because patent agents engage in the practice of law when representing clients before the Patent Office, the patent-agent privilege furthers the same important public interests as that of the attorney-client privilege.

The dissent in *Jaffee* noted that "the lawyer-client privilege [ ] is not identified by the broad area of advice giving practiced by the person to whom the privileged

---

[7] We recognize that many parties, in order to accommodate the long-standing ambiguity in the law of privilege between patent agents and their clients, include a licensed attorney on any and all communications to ensure that at least some privilege is maintained. This work-around is unsuitable for a system designed to give a real choice between selecting a non-attorney patent agent and a patent attorney. Indeed, it prejudices most of those independent inventors who may not have the resources to hire a patent attorney to maintain the privilege.

communication is given, but rather by the *professional status* of that person." 518 U.S. at 20 (Scalia, J., dissenting). The Supreme Court's characterization of the activity in *Sperry* coupled with the clear intent of Congress to enable the Office to establish a dual track for patent prosecution by either patent attorneys or non-attorney patent agents confers a *professional status* on patent agents that justifies our recognition of the patent-agent privilege. Patent agents, moreover, must pass an extensive examination on patent laws and regulations and must have a technical or scientific degree before they may represent patent applicants before the Patent Office. Finally, while patent agents certainly do not have the ethical obligations imposed on attorneys, they do have very specific ethical obligations imposed by the Patent Office. *See* Manual of Patent Examining Procedure ("MPEP") § 2001. The MPEP recognizes that "[a] patent by its very nature is affected with a public interest," and, as such, "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability." *Id.* § 2001(a). Indeed, recognizing the nature of the activities in which patent agents engage, the Patent Office has promulgated the "USPTO Rules of Professional Conduct," which conforms to the Model Rules of Professional Conduct of the American Bar Association. *See* 37 C.F.R. § 11.100 *et seq.*

### D. Scope of the Privilege

Notably, application of the rules of privilege to communications between non-attorney patent agents and their clients must be carefully construed. *See Nixon*, 418 U.S. at 710 ("Whatever their origins, these exceptions to the demand for every man's evidence are not . . . expansively construed . . . ."). Because patent agents are not attorneys, they are not authorized by the

bar of any state to practice law. As such, before asserting the patent-agent privilege, litigants must take care to distinguish communications that are within the scope of activities authorized by Congress from those that are not. The burden of determining which communications are privileged and which communications fall outside the scope of the privilege rests squarely on the party asserting the privilege. *See In re Google Inc.*, 462 F. App'x 975, 977 (Fed. Cir. 2012) ("The party asserting the attorney-client privilege has the burden of establishing the relationship and the privileged nature of the communication." (internal quotation marks omitted) (quoting *Ralls v. United States*, 52 F.3d 223, 225 (9th Cir. 1995))).

Regulations promulgated by the Office regarding the scope of a patent agent's ability to practice before the Office help to define the scope of the communications covered under the patent-agent privilege. In particular, 37 C.F.R. § 11.5(b)(1) provides:

> Practice before the Office in patent matters includes, but is not limited to, preparing and prosecuting any patent application, consulting with or giving advice to a client in contemplation of filing a patent application or other document with the Office, drafting the specification or claims of a patent application; drafting an amendment or reply to a communication from the Office that may require written argument to establish the patentability of a claimed invention; drafting a reply to a communication from the Office regarding a patent application; and drafting a communication for a public use, interference, reexamination proceeding, petition, appeal to or any other proceeding before the Patent Trial and Appeal Board, or other proceeding.

*Id.* Communications between non-attorney patent agents and their clients that are in furtherance of the perfor-

mance of these tasks, or "which are reasonably necessary and incident to the preparation and prosecution of patent applications or other proceeding before the Office involving a patent application or patent in which the practitioner is authorized to participate" receive the benefit of the patent-agent privilege. *Id.*; *see also id.* § 11.5(b)(1)(i)–(ii).

Communications that are not reasonably necessary and incident to the prosecution of patents before the Patent Office fall outside the scope of the patent-agent privilege. For instance, communications with a patent agent who is offering an opinion on the validity of another party's patent in contemplation of litigation or for the sale or purchase of a patent, or on infringement, are not "reasonably necessary and incident to the preparation and prosecution of patent applications or other proceeding before the Office." *Id.*; *see also* Changes to Representation of Others Before the United States Patent and Trademark Office, 73 Fed. Reg. 47,650-01, 47,670 (Aug. 14, 2008).[8]

E.  It is the Court's Role to Address the Question

The dissent's primary themes are that we should not recognize a patent-agent privilege because there is no need for such a privilege and, if there were, we should allow others to recognize it. We have addressed the first point already. We now briefly address the second. The

---

[8]  Not only would such communications fall outside the scope of the patent-agent privilege, they likely would constitute the unauthorized practice of law. *See id.* (discussing the range of activities that constitute the practice of law in front of the Patent Office and noting that "[t]he scope of activities involved in practice of patent law before the Office is not necessarily finite, and is subject to change as the patent statute changes and rules are promulgated to the [sic] implement statutory changes").

dissent first says we should defer to Congress to create a patent-agent privilege. But, after passage of the long-debated Rules Enabling Act of 1934, Congress granted the courts the authority to craft federal rules of procedure and evidence, including rules relating to privilege. *See* S. Rep. No. 1049, 73rd Cong., 2d Sess. (1934) (reprinting a letter from then-Attorney General Homer Cummings noting that the proposed bill would "empower the Supreme Court of the United States to prescribe rules to govern the practice and procedure in civil actions at law in the district courts of the Unites States and the courts of the District of Columbia," leading to "uniformity and simplicity in the practice in actions at law in Federal courts," "which, apart from its inherent merit, would also, it is believed, contribute to a reduction in the cost of litigation in the Federal courts"). Thus, Congress expressly and knowingly passed the torch to the courts to address the very question with which we are presented. The dissent's desire to defer to the Director of the Patent Office is equally off-base. While the Director may have asked for input on the question and may seek to urge rule changes based on policy views, the Director has no authority to create a privilege that would be applicable in court. For these reasons, we believe we not only have the authority to recognize this privilege, but are the ones squarely charged with considering the question under Rule 501.

We find, consistent with Rule 501 of the Federal Rules of Evidence, that a patent-agent privilege is justified "in the light of reason and experience." *See Jaffee*, 518 U.S. at 8. We therefore recognize a patent-agent privilege extending to communications with non-attorney patent agents when those agents are acting within the agent's authorized practice of law before the Patent Office.

## CONCLUSION

Thus, we grant Queen's University's petition for mandamus relief and order the district court to withdraw its

blanket order compelling the production of documents containing communications between Queen's University and its non-attorney patent agents. On remand, the court shall assess whether any particular claim of privilege is justified in light of the privilege we recognize today.

**REVERSED AND REMANDED**

# United States Court of Appeals for the Federal Circuit

---

**IN RE: QUEEN'S UNIVERSITY AT KINGSTON, PARTEQ RESEARCH AND DEVELOPMENT INNOVATIONS,**
*Petitioners*

---

2015-145

---

On Petition for Writ of Mandamus to the United States District Court for the Eastern District of Texas in No. 2:14-cv-00053-JRG-RSP, Magistrate Judge Roy S. Payne, Judge J. Rodney Gilstrap.

---

REYNA, *Circuit Judge*, dissenting.

I disagree that this court should create a new agent-client privilege. The presumption against the creation of new privileges has not been overcome by any showing that the public interest will be served or that there is a real need for such a privilege. Congress recognized that agents would not have the same privileges as attorneys, and no appellate court or legislature has created an agent-client privilege. An attorney-client-like privilege should not apply merely because someone is enabled to practice limited law before a single specific administrative agency.

Our federal justice system contemplates that parties are obligated to provide each other with information relevant to their dispute. This sharing of information has

multiple purposes.  It allows each side to determine what happened, and what the rights and responsibilities of the parties are as they seek a judicial resolution of their dispute.  But the obligation is also a promise that our justice system shall remain open to the public.  Our evidentiary rules allow for discovery precisely because our justice system seeks to ascertain the truth.  Truth is a weighty interest, and procedural bars on discovery must therefore be narrowly construed and new procedural bars not lightly created.  At first blush, it made sense, even common sense, that the attorney-client privilege be bent to cover patent agents.  But upon informed reflection, I found the factors courts consider in creating new privileges do not favor such a creation in this case.[1]  Here, the need to ascertain the truth should prevail.

### A PRESUMPTION AGAINST CREATING NEW PRIVILEGES EXISTS

Courts must hesitate before creating new privileges. "For more than three centuries it has now been recognized as a fundamental maxim that the public . . . has a right to every man's evidence.  When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule." *United States v. Bryan*, 339 U.S. 323, 331 (1950) (quoting 8 J. Wigmore, Evidence § 2192, at 64 (3d ed. 1940)).

That the demand for the truth is not to be derogated lightly is a cornerstone in the legitimacy of the U.S.

---

[1]    The Majority's opinion is based on "the light of reason and experience."  Maj. Op. at 26.  To be clear, this is not a dispute about law or statute, a factor that at the outset makes me leary.

system of justice. "[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974). Privileges are properly recognized "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Trammel v. United States*, 445 U.S. 40, 50 (1980) (quoting *Elkins v. United States*, 364 U.S. 206, 234 (1960) (Frankfurter, J., dissenting)).

NO SUFFICIENT PUBLIC INTEREST SUPPORTS FINDING AN
AGENT-CLIENT PRIVILEGE

A party seeking judicial recognition of a new evidentiary privilege under Rule 501 must demonstrate "that the proposed privilege will effectively advance a public good." *In re MSTG, Inc.*, 675 F.3d 1337, 1345 (Fed. Cir. 2012) (quoting *In re Sealed Case*, 148 F.3d 1073, 1076 (D.C. Cir. 1998)).

The Majority indicates that the benefits of an agent-client privilege would be analogous to those of the attorney-client privilege. Maj. Op. at 22–23. The attorney-client privilege is "rooted in the imperative need for confidence and trust." *Trammel*, 445 U.S. at 51. Its purpose is to encourage full and frank communication between an attorney and her clients and "thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Similarly, the Majority states that a "patent agent privilege 'serves public ends'" by helping meet the "imperative need for confidence and trust" in communications between agents and their clients. Maj. Op. at 22.

This court, however, has held that a "need for confidence and trust alone[] is an insufficient reason to create a new privilege." *In re MSTG, Inc.*, 675 F.3d at 1345

(citing *Univ. of Pa. v. EEOC,* 493 U.S. 182, 194–95 (1990) (rejecting privilege against disclosure of academic peer review materials)). We have explained that "the Supreme Court has rejected new privileges under Rule 501 even though recognition of a privilege would foster a relationship based on trust and confidence." *Id.*

Additionally, the unique nature of patent prosecution practice reduces any public interest benefit achieved by a privilege in encouraging full and frank communication between a client and agent. Under Patent Office regulations, patent lawyers, patent agents, inventors, and assignees, among others, have "a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability" of an application. 37 C.F.R. § 1.56. *See also, e.g.*, *Kingsland v. Dorsey*, 338 U.S. 318, 319 (1949). As a result, the interest of encouraging full and frank communication is less effectively served by creating an agent-client privilege. For example, a client who is seeking a patent may be uncertain whether certain activity the client has performed would make the invention she seeks to patent unpatentable. If her attorney or agent has properly informed her of the duty of candor to the Patent Office, however, the client will know that she has a duty to reveal this information to her attorney or agent, and that he must reveal it to the Patent Office if he believes it is material to patentability. And such information revealed to the Patent Office during the prosecution of a patent necessarily becomes public information.

As patent agents and clients are subject to a duty of candor before the USPTO, the Majority's agent-client privilege can be effective only to encourage the disclosure of information that the client does not believe is material to whether the invention is patentable. This is consistent with counsel for Queens University's statement at oral argument that, if the district court's order to compel was

upheld, "it's unlikely that we'll be able to show reversible error, to show that the mere compulsion of these documents has so tainted the case that this court should reverse on appeal." Recording at 5:34, *available at* http://cafc.uscourts.gov/oral-argument-recordings.

## NO PRESSING NEED FOR AN AGENT-CLIENT PRIVILEGE EXISTS

No pressing need for an agent-client privilege exists. "[N]onlawyers have practiced before the Office from its inception, with the express approval of the Patent Office and to the knowledge of Congress." *Sperry v. State of Fla. ex rel. Fla. Bar*, 373 U.S. 379, 388 (1963). Only a few cases have arisen during that time involving the issue of an agent-client privilege, which suggests that existing practices for dealing with the concerns the Majority seeks to remedy are sufficient.[2]

In today's practice, patent agent communications are usually found privileged when an agent is working under the supervision of an attorney. *See, e.g., Cuno, Inc. v. Pall Corp.*, 121 F.R.D. 198, 204 (E.D.N.Y. 1988); *People v. Hairston*, 444 N.Y.S.2d 853, 855 (Sup. Ct. 1981). While some agents work as solo practitioners, "patent agents are more commonly found in law firms or as part of an in-house patent team for a large company." Lisa Kennedy, *Patent Agents: Non-attorneys Representing Inventors*

---

[2] In *Jaffee v. Redmond*, 14 amicus briefs were filed supporting the recognition of a new privilege. 518 U.S. 1, 35 (1996). In this case, we have received no amicus briefs arguing that this court must create an agent-client privilege or that patent agents are greatly harmed by the lack of the privilege. Nor has this court ever been properly presented with this precise issue. Yet, patent agents have been practicing before the USPTO for over a century.

*Before the Patent Office,* 49 Advocate 21 (2006).[3]  A company desiring to use a patent agent but maintain a privilege may have its counsel, be it in-house or outside counsel, supervise the agent or hire an agent already working for a law firm.

Further, any purported need for an agent-client privilege is greatly minimized by the fact that patent agents and their clients have the opportunity to delete and destroy emails and other correspondence in the period of time between when they are exchanged and when they would be sought in litigation.  Particularly for patent prosecution, which often occurs years before any litigation involving the patent, patent agents and their clients may influence any obligation to produce documents and correspondence in litigation via their retention and destruction policies.

Under most circumstances, a patent agent helping a client prepare, file, and prosecute a patent application before the Patent Office has no duty to maintain in perpetuity all correspondence with the client regarding the patent application.  Similarly, it is considered good practice among attorneys to have thoughtful document retention and destruction policies, and to encourage such practices for their clients.  *See, e.g., The Sedona Guidelines: Best Practice Guidelines & Commentary for Managing Information & Records in the Electronic Age,* at iv (2d. ed. 2007), https://thesedonaconference.org/publications, ("Destruction is an acceptable stage in the information life cycle; an organization may destroy or delete electronic information when there is no continuing value or need to retain it.");  R. Thomas Howell, Jr. & Rae N. Cogar, *Developing and Implementing a Record Retention Program,* 50 Prac. Law. (ALI-ABA) 6, 26 (2004) ("If records are no longer of use in the business context and there are

---

[3]    See footnote 5, *infra,* at page 10.

no statutory, regulatory or investigative reasons to retain them, then it is in the company's best interest to dispose of them.").

It is apparent, therefore, that the practice of agents before the USPTO has not given rise to a pressing need for a privilege, especially given that sufficient privilege-like safeguards already exist.

### THIS COURT'S NEWLY-CREATED AGENT-CLIENT PRIVILEGE IS COMPLICATED AND UNCERTAIN

Where a proposed privilege has many exceptions or an uncertain scope, we should lean against creating it. *See, e.g.*, *Upjohn*, 449 U.S. at 393 ("An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all."); *In re MSTG, Inc.*, 675 F.3d at 1346 ("The existence of [] exceptions would distract from the effectiveness, clarity, and certainty of the privilege.").

I believe that the scope of this new privilege is more complicated than the Majority perceives.[4] The Supreme

---

[4]   The Majority Opinion discusses how the USPTO recently issued a "Request for Comments" on issues including whether an agent-client privilege should exist. Maj. Op. at 19 n.4. I question the imperative that this court must decide this issue at this point in time when it is already being considered by the agency authorized to regulate patent agents. To date, the USPTO has not recommended the creation of an agent-client privilege by courts. Were it to do so, the USPTO would provide valuable and practical guidance, such as the proper scope for such a privilege.

While Rule 501 permits courts to create new privileges "in the light of reason and experience," there is no need to rush to create a new privilege unrecommended by the Judicial Conference, the USPTO, the states, or the major-

Court in *Sperry* did not "determine what functions are reasonably within the scope of the practice authorized by the Patent Office." 373 U.S. at 402 n.47. As indicated by the regulation cited by the Majority as "help[ing] to define the scope of communications covered under the patent-agent privilege," Maj. Op. at 24, the scope of a patent agent's practice has not been precisely delimited. *See* 37 C.F.R. § 11.5(b)(1) ("Practice before the Office in patent matters includes, *but is not limited to¸* [a list of activities].") (emphasis added). The lack of certainty regarding the parameters of patent agent practice in turn makes the scope of the Majority's new privilege uncertain.

The Majority gives a few examples of activities that would not be privileged if conducted by an agent: "[f]or instance, communications with a patent agent who is offering an opinion on the validity of another party's patent in contemplation of litigation or for the sale or purchase of a patent, or on infringement." Maj. Op. at 25 (citing Changes to Representation of Others Before the United States Patent and Trademark Office, 73 Fed. Reg. 47,650-01, 47,670 (Aug. 14, 2008)).

However, 73 Fed. Reg. 47650 indicates that in some circumstances preparing an "opinion of the validity of another party's patent when the client is contemplating litigation" *is* properly within the scope of a patent agent's practice. The regulation explains that such an opinion is properly within the scope of an agent's practice when the client is "seeking reexamination of the other party's patent." *Id.* This analysis regarding reexaminations would also be true *of inter partes* review and other practice before the Patent Trial and Appeal Board.

---

ity of courts that have previously considered this issue. The courts should be cautious in creating a new privilege under such circumstances.

Therefore, under the Majority's newly created agent-client privilege, some validity opinions drafted by an agent will be privileged and others will not be, depending on the client's intent in seeking the opinion from the agent. But how do we determine which is which, and what does such contentious activity say about the demand for truth?

As another example, complications arise when we consider the scope of an agent's authority to prepare assignments and other contracts. Under 37 C.F.R. § 11.5(b)(1)(ii), in certain circumstances an agent may properly draft assignments "in contemplation of filing or prosecution of a patent application," as long as the agent "does no more than replicate the terms of a previously existing oral or written obligation of assignment."

The USPTO's comments on this regulation indicate that this express statement of what an agent is permitted to do does not necessarily exclude agents from preparing contracts in other circumstances. The USPTO explained that "[t]he Office's long-standing position has been that '[p]atent agents * * * cannot * * * perform various services which the local jurisdiction considers as practicing law. For example, a patent agent could not draw up a contract relating to a patent, such as an assignment or a license, if the state in which he/she resides considers drafting contracts as practicing law.'" Changes to Representation, 73 Fed. Reg. at 47,668 (ellipses in original).

Therefore, in some respects, the scope of a patent agent's authorized practice varies based on state law. Activities not expressly authorized by the USPTO's regulation are neither clearly prohibited or permitted, and instead are permitted or prohibited based on state law regarding the unauthorized practice of law.

As the regulation only permits an agent to prepare contracts for assignments occurring before an application is filed, the regulation does not address when it is appro-

priate for an agent to prepare assignments while an application is pending or after a patent issues. However, the USPTO comments on the regulation indicate that, in some circumstances, an agent may properly draw up an assignment for an issued patent. *Id.* Yet, in some circumstances, doing so would be outside the scope of an agent's authorized practice before the USPTO. *Id.*[5]

I believe that advising clients on whether a privilege would apply in court to the various acts a patent agent might be asked to perform is itself outside the scope of an agent's authorized practice before the USPTO. Therefore, a client concerned about maintaining a privilege may need to hire an attorney to determine whether this court's newly created agent-client privilege would apply in her circumstances.

## CONGRESS AND THE SUPREME COURT HAVE RECOGNIZED A DIFFERENCE BETWEEN AGENTS AND LAWYERS

The Majority Opinion focuses on Congress's approval of patent agents to practice before the USPTO. I do not see this approval as Congress seeking to vest patent agents with all benefits and obligations of an attorney. Rather, Congress saw the need to regulate agents' practice before the USPTO by limitation and restriction, and by ensuring that the distinction between a patent agent

---

[5]    *See, e.g.*, David Hricik, *Patent Agents: The Person You Are*, 20 Geo. J. Legal Ethics 261, 269 (2007) ("Patent agents are often employed by law firms that do not limit their practice to patent prosecution."). Query whether a patent agent may direct a patent lawyer, or own an enterprise limited to USPTO practice that employs patent lawyers? Does not this new privilege create a slippery slope toward the practice of law being treated not as a profession, but as a mere trade? These questions have not been explored by the court, but should they be?

and a patent lawyer was clear and bright, for the public good.

In a hearing before the House Committee on Patents in 1928, several members of Congress challenged the USPTO's practice at that time of allowing patent agents to call themselves "patent attorneys," as they found it misleading. *Prevention of Fraud in Practice Before the Patent Office: Hearing on H.R. 5527 Before the H. Comm. on Patents*, 70th Cong., 1st Sess. 17–19 (1928). For example, one member of Congress explained that it was misleading to inventors when they hired a "patent attorney" to prosecute a patent expecting that they were hiring a lawyer who would also be able to help them protect their rights in court. *Id.* at 19.[6]

In discussing a law that would restrict patent agents from using the terms "patent lawyers" and "patent attorneys," both a member of Congress and the Commissioner of Patents indicated that they thought "the law [] should be made so plain that it would give the public all the notice possible as to just whom a man is employing, and what the extent of that person's privileges may be when he comes to employ him to handle his work." *Id.* at 16.

To remedy this confusion between agents and attorneys, a regulation that "prohibited agents so registered from representing themselves to be attorneys, solicitors or lawyers" was promulgated, as the Supreme Court in

---

[6] The Patent Office initially allowed patent agents to use the term "attorney" (but not "lawyer") because they were considered to be "attorneys-in-fact." *Id.* at 17, 22–23, 68, 91. An "attorney-in-fact" is "[s]trictly, one who is designated to transact business for another; a legal agent." Attorney, Black's Law Dictionary (10th ed. 2014). In contrast, an "attorney-at-law" is defined as "[s]omeone who practices law; LAWYER." *Id.*

*Sperry* noted.   373 U.S. at 393 n. 29.   *See* 37 C.F.R. § 11.704(b) ("A registered practitioner who is an attorney may use the designation 'Patents,' 'Patent Attorney,' 'Patent Lawyer,' 'Registered Patent Attorney,' or a substantially similar designation.   A registered practitioner who is not an attorney may use the designation 'Patents,' 'Patent Agent,' 'Registered Patent Agent,' or a substantially similar designation").[7]  The focus on this distinction is an indication that allowing agents to practice before the USPTO was not intended to work to confer on patent agents the professional status of lawyers.

Similarly, in *Sperry* the Supreme Court recognized a distinction between non-attorney patent agents and lawyers formally admitted to practice before a state bar. 373 U.S. at 394–96.  As one district court has stated, "[t]o argue that because a patent agent competently engages in legal activities similar to those of an attorney, he should be accorded the status of an attorney is to turn the logic of *Sperry* on its head.  *Sperry* held that although patent agents are not equivalent to attorneys, they may engage in the practice of law with respect to patent activities

---

[7]   The USPTO's regulation prohibiting non-attorney patent agents from marketing themselves as "attorneys" took effect in 1959.  37 C.F.R. § 1.345(c) (1959) ("No agent shall, in any material specified in paragraph (b) of this section or in papers filed in the Patent Office, represent himself to be an attorney, solicitor, or lawyer.").   Though non-attorney agents challenged the promulgation of this regulation, it was upheld.  *See Evans v. Watson*, 269 F.2d 775, 777–78 (D.C. Cir. 1959) (affirming the USPTO's regulation that prevents a non-attorney patent agent from representing himself to be an attorney, solicitor or lawyer); *cf. People v. Miller*, 252 N.Y.S.2d 497, 498 (N.Y. 1964) ("The connotation of the word 'attorney' needs no elucidation.").

before the U.S. Patent Office, as authorized by Congress." *In re Rivastigmine Patent Litig.*, 237 F.R.D. 69, 102 (S.D.N.Y. 2006); *see also, e.g.*, *Agfa Corp. v. Creo Products, Inc.*, No. CIV.A. 00-10836GAO, 2002 WL 1787534, at *3 (D. Mass. Aug. 1, 2002) ("[U]nderlying the issue resolved in *Sperry* is the recognition that there is a clear distinction between a non-lawyer patent agent and a lawyer formally admitted to practice before a state bar.").

The Majority reasons that agents must have a privilege because otherwise it would "frustrate [Congress's purpose] to afford clients the freedom to choose between an attorney and a patent agent." Maj. Op. at 19. Would that analysis also require permitting agents to practice before courts, for example, in appealing the USPTO's rejection of patent claims to this court? It seems that a client in that situation who hired an agent is disadvantaged in needing to additionally hire a patent lawyer, whereas someone who had hired a patent lawyer to prosecute the patent before the USPTO could continue to use the same lawyer before this court.

Congress Intended that Agents Not Have a Privilege

"[I]n determining whether a new privilege should be adopted, courts look to whether Congress had considered that or related questions." *In re MSTG, Inc.*, 675 F.3d at 1343 (citing *Univ. of Pa.,* 493 U.S. at 189).

As discussed below, Congress was aware already in 1928 that agents would not be able to claim a privilege on behalf of their clients if the patents they helped prosecute became involved in litigation. While Congress recognized that allowing clients to use patent agents would provide some advantages and disadvantages, no legislation has been adopted creating an agent-client privilege. It is not appropriate for this court to "strike the balance differently from the one Congress has already adopted." *Id.* at 1344.

The Majority cites with approval, as did the Supreme Court in *Sperry*, certain testimony from the Commissioner of Patents before Congress in 1928 that the rights of patent agents before the Patent Office were to be exactly the same as patent lawyers:

> When asked "[w]hat is going to be the difference in the legal prerogatives of the agents and the others that come in," the Commissioner of Patents responded that *"their rights in the Patent Office will be exactly the same.* Their rights in the courts will be different." (Emphasis added.)

*Sperry*, 373 U.S. at 294 (quoting *Prevention of Fraud in Practice Before the Patent Office: Hearings on H.R. 5527 Before the H. Comm. on Patents*, 70th Cong., 1st Sess. 15 (1928)); Maj. Op. at 16–17.

As this testimony indicates, patent agents' rights in the courts would be different. The Commissioner of Patents further explained that patent agents' rights in court would be different from those of patent lawyers in two respects: patent agents would not be able to represent their clients in court, and they would also not be able to claim privilege for their clients in court. [8] This exchange

---

[8] The testimony was as follows:

Mr. JENKINS. What is going to be the difference in the legal prerogatives of the agents and the others that come in?

Commissioner ROBERTSON. Their rights in the Patent Office will be exactly the same. Their rights in the courts will be different. For example, a man who is merely a patent agent under the present law, who is not a patent attorney and is not a member of the bar, cannot take his case to the court of appeals. He will have to employ

demonstrates that the USPTO, the agency authorized by Congress to regulate patent agents, and Congress understood that they were not extending a privilege to patent agents. Congress knew that the agents it was authorizing to practice before the Patent Office would not be able to claim a privilege on behalf of their clients, and it did not consider creating such a privilege. In this manner, Congress has already expressed its intent, one that this court has no apparent basis at this time to override. When the Majority asserts that *not creating* an agent-client privilege would "undermin[e]" Congress's decision to allow agents to practice, it overlooks the fact that Congress understood that patent agents would not have such a privilege. Maj. Op. at 22.

---

somebody else who is a member of the bar to take his case to the court of appeals. So, when this bill goes through, we will have patent attorneys, members of the bar, and patent agents, nonmembers of the bar, all having the same prerogatives in the Patent Office, except this, that if their clients get mixed up in court proceedings–

Mr. JENKINS. They will be employing as a patent lawyer to represent them a man who is not a patent lawyer here in the courts?

Commissioner ROBERTSON. Not that, but if their clients get mixed up in civil proceedings in the courts, the one who has a lawyer for his attorney will have a lawyer who is able to claim privilege for his client; but the man who has an agent for his attorney will not be able to claim that privilege.

*Prevention of Fraud in Practice Before the Patent Office: Hearing on H.R. 5527 Before the H. Comm. on Patents*, 70th Cong., 1st Sess. 15 (1928).

The Majority attempts to discount the exchange described above by stating that it was "unrelated to the actual purpose for which the Commissioner's testimony was solicited—*i.e.*, the treatment of patent agents and patent attorneys before the Patent Office." Maj. Op. at 17 n.2. That is not correct. Congress sought the Commissioner to testify regarding certain proposed legislation. *Prevention of Fraud in Practice Before the Patent Office: Hearing on H.R. 5527 Before the H. Comm. on Patents*, 70th Cong., 1st Sess. 5 (1928). One provision of that legislation made it unlawful for agents to hold themselves out as lawyers or attorneys unless they were "legally admitted to practice law in a State or Territory," or certain other areas like the District of Columbia. *Id.* at 2. This testimony was regarding that provision. *See id.* at 14.

The Majority discounts that Congress understood that agents authorized to practice before the USPTO would not have a privilege in courts by asserting that "neither the Commissioner nor Congress could have foreseen in 1928 that patent litigation would expand as it has." Maj. Op. at 17 n.2. This assertion is irrelevant. Even if it were relevant, the growth of patent litigation is not limited to recent years.[9] The swing of the patent litigation pendulum is well known in the industry.

---

[9]  Recent scholarship has indicated that, in the mid- to late-1800s, the United States experienced a period where patent litigation surged. Christopher Beauchamp, *The First Patent Litigation Explosion*, 125 Yale L. J. 796 (2016). "[T]he nineteenth century saw an even bigger surge of patent cases" than the twenty-first century has. *Id.* at Abstract. For example, "[e]ven the absolute quantity of late-nineteenth-century patent cases bears comparison to the numbers filed in recent years: the Southern District of New York in 1880 would have ranked third on the list of districts with the most patent infringement

The Majority states that "neither the Commissioner nor Congress could have foreseen in 1928 . . . that the prosecution history of patents would take on such a meaningful role in [] litigation, both in connection with claim construction and in connection with a variety of invalidity and unenforceability challenges." Maj. Op. at 17 n.2. However, this factor, even if true, is irrelevant to whether there should be an agent-client privilege, as the prosecution history of a patent is never protected by any privilege.

Prosecution history is "the public record of the patent proceedings." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 727 (2002). Prosecution history, also known as the "file wrapper" of a patent, "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005).

For good reason, the prosecution histories of all patents are open to public inspection under 37 C.F.R. § 1.11. In most cases, a patent's prosecution history can even be found online freely available for download from the USPTO's website. While it may be true that prosecution histories have taken on a more significant role in litigation since 1928, the full range of the history of a patent's prosecution rightfully continues to remain open to the public's full scrutiny.[10]

---

suits filed in 2014 and would have headed the list as recently as 2010." *Id.*

[10]    The Majority states that Congress has since 1934 "passed the torch" for creating new privileges to the courts. Maj. Op. at 26. This is incorrect. For example, in 1998 Congress created a limited privilege for non-lawyers authorized to practice before the Internal Revenue Ser-

NO STATE HAS CREATED AN AGENT-CLIENT PRIVILEGE

"[T]he policy decisions of the States bear on the question whether federal courts should recognize a new privilege or amend the coverage of an existing one." *Jaffee*, 518 U.S. at 12–13. In *Jaffee*, the Supreme Court indicated that the propriety of federal court recognition of a psychotherapist privilege under Rule 501 was "confirmed by the fact that all 50 States and the District of Columbia have enacted into law some form of psychotherapist privilege." *Id.* at 12. Here, in contrast, we are aware of no state that has enacted legislation recognizing an agent-client privilege.

The Majority argues that this factor is "irrelevant given the uniquely federal character of the activities at issue here." Maj. Op. at 20. However, the Supreme Court's determination in *Sperry* that states cannot prohibit patent agents from practicing before the USPTO does not mean that the state courts and legislatures could not have recognized an agent-client privilege. To the contrary, states do have the legislative authority to create an agent-client privilege, and doing so would not "conflict with the federal determination that patent agents may practice law before the Patent Office." Maj. Op. at 21.

As states establish their own requirements for claiming privilege in their courts, state courts do not have to recognize federal common law privileges under Rule 501. "Federal decisions on testimonial privileges are not binding on the states." *Loesche v. State*, 620 P.2d 646, 649 n.4 (Alaska 1980). *See also, e.g.*, *People v. Gonzales*, 296 P.3d 945, 966–67 (Cal. 2013) ("In *Jaffee* . . . the United States Supreme Court adopted a psychotherapist-patient privilege applicable in federal proceedings, but the *Jaffee*

---

vice. 26 U.S.C. § 7525; *United States v. Frederick*, 182 F.3d 496, 502 (7th Cir. 1999).

decision was grounded in the Federal Rules of Evidence, not the federal Constitution, and subsequent lower court decisions confirm that the federal psychotherapist-patient privilege recognized in *Jaffee* 'is not rooted in any constitutional right of privacy.'") (footnote omitted); *State v. Roach*, 669 N.E.2d 1009, 1011–12 (Ind. Ct. App. 1996) (reversing a trial court's expansion of Indiana privilege law, which had been based in part on a United States Supreme Court decision on federal common law privilege).[11] States could have previously recognized an agent-client privilege. And this court's decision will neither obligate states to recognize an agent-client privilege nor prohibit them from recognizing one.

Indeed, the federal common law privilege law does not even control all proceedings in federal courts. State privilege law governs in federal civil cases "regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. In *Lebovitz v. Hartford Insurance Co. of the Midwest*, 918 F. Supp. 2d 422, 425–26 (W.D. Pa. 2013), the court noted that *Jaffee* was not dispositive of whether a social worker was protected by Pennsylvania's statutory "psychiatrist/licensed psychologist privilege," as it was a diversity action in which Pennsylvania privilege law applied.

States have applied state law in the past when determining whether to grant agents a privilege. *See, e.g.*, *Kent Jewelry Corp. v. Kiefer*, 113 N.Y.S.2d 12, 16 (Sup. Ct. 1952) (applying New York law to determine if communications between a patent agent and client were privileged).

---

[11] Also, for example, under California law, no privilege can be recognized in the absence of an express statutory provision. Cal. Evid. Code § 911; *Chronicle Publ'g Co. v. Superior Court*, 354 P.2d 637, 645 (Cal. 1960).

The fact that Congress has authorized patent agents to practice before the Patent Office does not require a different result: Congress also authorized patent lawyers to practice before the Patent Office, but states apply state law in determining whether to grant them a privilege as well. *See, e.g.*, *R.G. Egan Equip., Inc. v. Polymag Tek, Inc.*, 758 N.Y.S.2d 763, 771 (Sup. Ct. 2002) (applying New York law to determine if correspondence between a patent attorney and client was protected by the attorney-client privilege); *Zirn v. VLI Corp.*, 621 A.2d 773, 780 (Del. 1993) (applying Delaware law to determine whether communications with patent counsel that was practicing before the Patent Office were privileged); *Beacon Oil Co. v. Perelis*, 160 N.E. 892, 894 (Mass. 1928) (citing Massachusetts case law in determining if communications with patent attorneys were privileged). *See also, e.g.*, *In re Monsanto Co.*, 998 S.W.2d 917, 931 (Tex. App. 1999) (applying Texas law to determine if correspondence about patent application with attorneys was protected by the attorney-client privilege).

It is interesting to contemplate how the Majority determines that a federal common law agent-client privilege should be created, but nonetheless finds that for a state court to have recognized such a privilege would conflict with federal patent law. In addition, the Majority does not address why a state would lack authority to create a privilege when federal patent law issues arise in cases that state courts may properly adjudicate, such as cases involving malpractice, fraud, licenses, and contracts involving patent rights. *See, e.g.*, *HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co.*, 600 F.3d 1347, 1354 (Fed. Cir. 2010) (cases implicating patent law issues do not arise under federal patent law if an alternative, non-patent theory may entitle the plaintiffs to their requested relief); *see also, e.g.*, *Bd. of Regents, Univ. of Tex. Sys. v. Nippon Tel. & Tel. Corp.,* 414 F.3d 1358, 1365 (Fed. Cir. 2005). Admittedly, the frequency with which the issue of an

agent-client privilege arises in state courts is less than, for example, a psychotherapist privilege. However, there is nothing prohibiting states from recognizing an agent-client privilege. As no states have recognized an agent-client privilege, the fact that this court's decision will not be binding on state courts or federal courts in diversity cases weighs against creating a privilege here. Having overlooked these circumstances, this court's decision will only serve to create confusion and uncertainty regarding whether the agent-client privilege applies, for yesterday none existed.

THE JUDICIAL CONFERENCE ADVISORY COMMITTEE DID NOT RECOMMEND CREATING AN AGENT-CLIENT PRIVILEGE

Related history of the Judicial Conference of the United States weighs against finding a privilege here. First, the Judicial Conference Advisory Committee did not recommend an agent-client privilege in its 1973 proposed rules of evidence. Second, it appears that the Judicial Conference has not in recent years recommended such a privilege be created nor taken up the issue.

"[I]n determining whether new privileges should be recognized, the Supreme Court has been influenced by the list of evidentiary privileges recommended by the Advisory Committee of the Judicial Conference in its proposed Federal Rules of Evidence." *In re MSTG, Inc.*, 675 F.3d at 1342–43 (citing *Jaffee,* 518 U.S. at 13–14; *United States v. Gillock,* 445 U.S. 360, 367–68 (1980)).

"Under the Judicial Conference proposed rules submitted to Congress, federal courts would have been permitted to apply only nine specifically enumerated privileges, except as otherwise required by the Constitution or provided by Acts of Congress." *Gillock*, 445 U.S. at 367. "Congress substituted the present language of Rule 501 for the draft proposed by the Advisory Committee of the Judicial Conference of the United States to provide

the courts with greater flexibility in developing rules of privilege on a case-by-case basis." *Id.*

While the Advisory Committee's nine privileges were not adopted, the Supreme Court's holding in *Gillock* that Rule 501 did not include a state legislative privilege "relied, in part, on the fact that no such privilege was included in the Advisory Committee's draft." *In re MSTG, Inc.*, 675 F.3d at 1345. Similarly, the Supreme Court in *Jaffee* found it persuasive in creating a psychotherapist privilege "that a psychotherapist privilege was among the nine specific privileges recommended" by the Judicial Conference Advisory Committee when it submitted its Proposed Federal Rules of Evidence. 518 U.S. at 14.

An agent-client privilege was not among the nine privileges included in the Advisory Committee's draft Rules of Evidence. S. Rep. No. 93-1277 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7058. The Supreme Court's analysis of other proposed new privileges since the draft rules were proposed indicates that this weighs against creating an agent-client privilege.

Further, as the Judicial Conference is the national policy-making body for the federal courts, it remains tasked with "carry[ing] on a continuous study of the operation and effect of the general rules of practice and procedure now or hereafter in use as prescribed by the Supreme Court for the other courts of the United States pursuant to law." 28 U.S.C. § 331.

The Judicial Conference is charged with recommending to the Supreme Court any changes in federal court procedures that it deems "desirable to promote simplicity in procedure, fairness in administration, the just determination of litigation, and the elimination of unjustifiable expense and delay." *Id.*

To my understanding, the Advisory Committee has not even considered the issue of whether an agent-client

privilege should be created, at least not within the past decade. That the Advisory Committee has not entertained the issue also weighs against creating an agent-client privilege.[12]

### LAWYERS HOLD A PRIVILEGE BECAUSE OF THEIR PROFESSIONAL STATUS

Contrary to the Majority opinion, the attorney-client privilege is not accorded to attorneys because they provide legal advice or practice law, but because of their professional status as attorneys. A communication made for the purpose of securing a legal opinion, legal services, or assistance in a legal proceeding is usually only privileged if it was expressed to "a member of the bar of a court, or his subordinate." *United States v. United Shoe Mach. Corp.*, 89 F. Supp. 357, 358 (D. Mass. 1950). "There is no doubt that the federal common law limits the attorney-client privilege to communications between the client and a member of the bar or that attorney's agent." *Duttle v. Bandler & Kass*, 127 F.R.D. 46, 52 (S.D.N.Y. 1989).

Courts in the past have regularly rejected attempts to extend an attorney-client-type privilege to non-lawyers, even when those non-lawyers act in a role also played by lawyers in other cases. *See, e.g., Couch v. United States*, 409 U.S. 322, 335 (1973) (no accountant-client privilege); *Velasquez v. Borg*, No. 93-15566, 1994 WL 327328, at *1 (9th Cir. June 8, 1994) (no "jailhouse-lawyer" privilege); *Moorhead v. Lane*, 125 F.R.D. 680, 686–87 (C.D. Ill. 1989)

---

[12] I disagree with the Majority that the adoption of Rule 501 means that the Judicial Conference may no longer recommend that federal courts recognize certain privileges. For example, in 2007, the Judicial Conference recommended a new rule about the waiver of a specific privilege, the attorney-client privilege. *See* Fed. R. Evid. 502 advisory committee notes.

(same); *Dabney v. Inv. Corp. of Am.*, 82 F.R.D. 464, 466 (E.D. Pa. 1979) (no law-student privilege).

I agree with Justice Scalia that "the prototypical evidentiary privilege analogous to the one asserted here—the lawyer-client privilege—is not identified by the broad area of advice giving practiced by the person to whom the privileged communication is given, but rather by the *professional status* of that person. Hence, it seems a long step from a lawyer-client privilege to a tax advisor-client or accountant-client privilege." *Jaffee*, 518 U.S. at 20 (Scalia, J., dissenting). While a patent agent may provide the same type of advice that a patent lawyer does—just as a tax advisor or accountant may provide the same type of advice that a tax attorney does—that does not necessitate that their communications be found privileged.

As the Supreme Court discussed in *Sperry*, patent agents are like other non-lawyers Congress has permitted to practice before federal agencies. 373 U.S. at 388, 396–400; 5 U.S.C. § 555. For example, under 8 C.F.R. § 292.1, certain categories of non-lawyers are authorized to represent others in immigration proceedings. *See, e.g.*, *Ramirez v. Immigration & Naturalization Serv.*, 550 F.2d 560, 563–64 (9th Cir. 1977). For some of the categories, the non-lawyers do not need to have any training or certification to represent parties in immigration proceedings.[13] *See, e.g.*, 8 C.F.R. § 292.1(3).[14]

---

[13] Patent Office regulations also permit unregistered individuals "to prosecute as attorney or agent" before the Patent Office, in limited circumstances. 37 C.F.R. § 11.9(a).

[14] Apparently no courts have recognized a privilege for these non-lawyers representing others in immigration proceedings. *See, e.g.*, *United States v. Arango-Chairez*, 875 F. Supp. 609, 612 n.3 (D. Neb. 1994); Ann Naffier,

While the Majority asserts that it is "without question that the privilege attaches to a communication made 'for the purpose of securing primarily legal opinion, or legal services, or assistance in a legal proceeding,'" Maj. Op. at 12 (citing *Spalding*, 203 F.3d at 805), this court in *Spalding* actually held "that *an invention record* constitutes a privileged communication, as long as it is provided *to an attorney* 'for the purpose of securing primarily legal opinion, or legal services, or assistance in a legal proceeding.'" *Id.* (quoting *Knogo Corp. v. United States,* No. 194-79, 1980 WL 39083 (Ct. Cl. 1980)) (emphases added).

### THE SUPREME COURT HAS NEVER HELD THAT PATENT AGENTS PRACTICE LAW

Even if a privilege should extend to anyone who practices law, the Supreme Court has never held that patent agents practice law. The Majority describes the Supreme Court in *Sperry* as "determining [that] the activities of patent agents before the Patent Office constitute the practice of law." Maj. Op. at 13. However, the Court in *Sperry* did not hold that patent agents practice law. What it said was that it did "not question the [Supreme Court of Florida's] determination that *under Florida law* the preparation and prosecution of patent applications for others constitutes the practice of law." *Sperry*, 373 U.S. at 383.

In support, the Supreme Court cited two cases that stand for the proposition that state courts are the final authority on interpreting state law: *Greenough v. Tax Assessors*, 331 U.S. 486, 497 (1947) (state courts "are the final judicial authority upon the meaning of their state

_____

*Attorney-Client Privilege for Nonlawyers? A Study of Board of Immigration Appeals-Accredited Representatives, Privilege, and Confidentiality*, 59 Drake L. Rev. 583, 600 (2011).

law"); and *Murdock v. City of Memphis*, 87 U.S. 590, 635 (1874) ("we must receive the decision of the State courts as conclusive" on issues not conferred by statute on federal courts).

*Sperry* merely held that Florida could not bar patent agents from practicing before the USPTO as the unauthorized practice of law. 373 U.S. at 404. That holding does not necessitate the finding that patent agent communications are privileged. The Supreme Court has also held that, without providing an effective alternative, states cannot bar inmates from providing each other legal assistance, despite claims that this was the unauthorized practice of law. *Johnson v. Avery*, 393 U.S. 483, 490 (1969). And yet such inmates, "jailhouse lawyers," have typically not been accorded attorney-client or a "jailhouse-lawyer" privilege. *Moorhead v. Lane*, 125 F.R.D. 680, 686 (C.D. Ill. 1989); *People v. Velasquez*, 192 Cal. App. 3d 319, 329 (Ct. App. 1987); *Commonwealth v. Paradiso*, 507 N.E.2d 258, 262 (Mass. App. Ct. 1987); *State v. Spell*, 399 So. 2d 551, 556 (La. 1981).

CONGRESS DID NOT LEGISLATE FOR AGENTS TO PRACTICE LAW

Congress never believed that patent agents practice law, but rather that agents could appear and practice before an administrative agency. For example, in discussing the need for a method of disciplining patent agents who defrauded clients, as bar associations had no authority over them, a member of Congress stated "[a] patent attorney is not allowed *to practice law as a regular attorney is allowed*. He is not required to have the same legal training and skill and experience and so forth." 62 Cong. Rec. 1064–65 (1922) (emphasis added). *See also, e.g.*, 59 Cong. Rec. 3926 (1920) ("In order to become a patent attorney does a man have to go through an examination? Does he have to establish good character and all that kind

of thing?  Attorneys *who practice law* have to do that.")
(emphasis added).

Even though patent agents practice before the
USPTO in the same way patent lawyers do, a majority of
the other courts that have considered this issue have
concluded that an agent-client privilege does not exist.
*See, e.g.*, *In re Rivastigmine Patent Litig.*, 237 F.R.D. 69,
102 (S.D.N.Y. 2006) ("But it does not follow that because
the agent is permitted to engage in this defined subuni-
verse of legal practice, his activities are therefore equiva-
lent to those of a practicing attorney."); *Agfa Corp. v. Creo
Prods., Inc.*, No. 00-10836-GAO, 2002 WL 1787534, at *2
(D. Mass. Aug. 1, 2002) ("The 'looks like a duck, walks like
a duck' analysis . . . works only if it regards as insignifi-
cant the fact that privilege is rooted, both historically and
philosophically, in the special role that lawyers have, by
dint of their qualifications and license, to give legal ad-
vice.").

CONCLUSION

Congress authorized the USPTO to permit non-
lawyers to practice before the U.S. Patent and Trademark
Office in patent matters, but recognized that clients who
chose to use agents would have some disadvantages.  One
disadvantage was that their communications with their
agent would not be privileged.

In *Jaffee*, Justice Scalia, writing in dissent, persua-
sively argued that the question before the Court was
"whether (1) the need for [the asserted] privilege is so
clear, and (2) the desirable contours of that privilege are
so evident, that it is appropriate for this Court to craft it
in common-law fashion, under Rule 501."  518 U.S. at 35.
The need for an agent-client privilege is not clear, it is not
evident what the precise contours of such a privilege will
be, and it is not appropriate for this court to create it in
common-law fashion, under Rule 501.

None of the factors which courts consider in creating new privileges favor finding a new privilege here. I dissent, because in the absence of a showing that there is a real need for a new privilege to be created, the need to ascertain the truth should prevail.